William S. BIGLEY, Appellant,

v.

ALASKA PSYCHIATRIC INSTITUTE, Appellee.

No. S–13116.

Supreme Court of Alaska.

May 22, 2009.

30. *See Reasonableness, supra* note 9 at 6–7.

James B. Gottstein, Law Project for Psychiatric Rights, Inc., Anchorage, for Appellant.

Timothy M. Twomey, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A psychiatric patient committed to the Alaska Psychiatric Institute (API) challenges the superior court's order approving API's petition for involuntary administration of psychotropic drugs under AS 47.30.839. He alleges that the trial court violated due process guarantees and that it erred in its findings that API's proposed treatment was in his best interests and that no less intrusive alternative was available. Because the patient was subsequently released without treatment, the case is technically moot, but we decide it because it falls within the public interest exception to the mootness doctrine. We conclude that, because the patient did not receive adequate notice of the nature of the proceedings and access to his medical chart, he was denied due process. We accordingly issue declaratory relief clarifying these due process requirements.

## II. FACTS AND PROCEEDINGS

### A. Facts

This case concerns a petition by API to administer psychotropic medication to an un-consenting adult, William Bigley. Bigley's first hospitalization at API was in 1980. He exhibited threatening and bizarre behavior, delusions, and auditory hallucinations; API diagnosed him with schizophreniform disorder and treated him with anti-psychotic medications. During another hospitalization at API in 1981, he was diagnosed with paranoid schizophrenia.

Bigley was hospitalized dozens of times in the next two decades in a "revolving door" pattern of arrest, hospitalization, release, and relapse. In 1996 a court appointed the Office of Public Advocacy (OPA) as Bigley's conservator to manage his finances, and OPA became Bigley's guardian later in 2004. Throughout the years of his mental illness, it appears that Bigley generally denied that he had any psychiatric problems. He has often quit taking the psychotropic medications prescribed to him after his hospitalizations have ended. Bigley resented being placed under guardianship and has sought to terminate the guardianship. Doctors attribute Bigley's resistance to medication to his delusional belief that people are attempting to poison him. However, it is also true that the medications have sometimes produced harmful physical side effects, ranging from relatively minor (weight gain, sedation) to serious and irreversible (a movement disorder known as tardive dyskinesia).[1]

According to a 2004 report by a court-appointed visitor, Bigley's mental condition and living conditions had recently taken an alarming turn for the worse. He had been living in an apartment for four years, but his angry and belligerent behavior escalated and he was evicted. He appeared underweight. The visitor thought he was "spinning out of control" and "quite angry," and concluded that he was unable to manage his own affairs.

By early 2007 Bigley had been in API at least sixty-eight times.[2] He had periods

---

1. "Tardive dyskinesia involves 'slow, rhythmical, repetitive, involuntary movements of the mouth, lips, and tongue'; it is permanent, and its symptoms cannot currently be treated." *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 241–42 (Alaska 2006) (quoting *Steele v. Hamilton County Cmty. Mental Health Bd.*, 90 Ohio St.3d 176, 736 N.E.2d 10, 17 (2000) (quoting WINICK, THE RIGHT TO REFUSE MENTAL HEALTH TREATMENT 72–73 (1997))).

2. Although API records describe a February 2007 admission as Bigley's sixty-eighth admission, an API psychiatrist testified at the May 2008 hearing

where his symptoms were moderate enough that he was able to live in assisted living or other forms of housing for short periods. There were other times when he lived on the streets. According to doctors at API, his periods of stability coincided with his acceptance of the medication prescribed to him, while when he stopped taking the medications, his delusions and disturbing behavior became more intense and he became homeless. For a period in 2007, Bigley received assistance with living in the community from a nonprofit mental health services provider called CHOICES, Inc.

In 2008 Bigley's situation was highly unstable. He had lost his most recent housing at a motel and refused another room his guardian found for him. Bigley's guardian reported that Bigley was not eating or drinking, could not express himself coherently, did not seem to recognize him, and refused an offer of money or a bus pass. The guardian said he had never seen Bigley in such a bad state and called the police.

Meanwhile, Bigley was involved in a series of disturbances at the First National Bank in Anchorage. Bigley often came into the bank to withdraw funds. In recent visits he had become disruptive, making hostile and threatening statements to bank employees and customers. Employees became frightened, so the bank banned him from the premises and hired a security guard to deal with his visits. On April 25 a police officer who responded to one of these disturbances took Bigley into custody and requested an emergency mental health evaluation.

At API Bigley was agitated, angry, and delusional. He refused to eat or drink, and had to be housed in locked seclusion because his behavior intimidated other residents, some of whom tried to retaliate physically. API records say he believed his food and drink were poisoned, that he had God-like powers, spoke repeatedly of natural and man-made catastrophes, and talked about blowing things up. While the professionals who dealt with him did not think he was dangerous, they worried his aggressive behavior could sooner or later provoke someone he encountered outside the hospital to assault him.

## B. Proceedings

### 1. Commitment and related proceedings

On April 26, 2008, a magistrate issued an ex parte order committing Bigley to psychiatric evaluation after finding probable cause that he was mentally ill and that he was gravely disabled or presented a likelihood of causing serious harm to himself or others. The order also appointed the public defender to represent Bigley.

On April 28 API petitioned for a thirty-day commitment, and also petitioned for court approval of non-crisis administration of psychotropic medication. On that same day, an attorney, James Gottstein of the Law Project for Psychiatric Rights, e-mailed API and the public defender to inform them that he was representing Bigley with respect to what he called the "forced drugging" petition. In the e-mail he stated the view that Bigley had likely acted out as a way to get shelter at API during cold weather. He proposed a plan under which Bigley would be housed and fed at API.

The public defender's office represented Bigley at the commitment hearing on April 30, 2008. Attorney Gottstein filed a limited entry of appearance to represent Bigley regarding the petition for court-ordered administration of medication. The public defender objected to Gottstein's appearing on Bigley's behalf. The master agreed that should Bigley be committed, Gottstein could appear for Bigley during the subsequent involuntary medication proceedings. However, until that time, the master said she would not allow Gottstein to appear as counsel, cautioning him that "you're not co-counsel and you're not to be sitting at the table with them or interfering with their conduct of the case."

At the April 30 hearing, the master heard evidence and found that Bigley was gravely disabled under AS 47.30.915(7). On May 5 the superior court adopted the findings of fact and ordered Bigley committed to API

at issue in this case that Bigley had been admitted to API seventy-seven times.

for mental health treatment for a period not to exceed thirty days.

### 2. Proceedings on administration of psychotropic medication

On May 7 API moved for an expedited hearing on the medication petition, noting that under AS 47.30.839(e), a hearing is required on the patient's capacity to give or withhold informed consent within seventy-two hours of the petition. On May 9 (a Friday) the court notified the parties that it was going to hold an expedited hearing on the medication petition on May 12 (Monday).

At the May 12 hearing on the medication petition, Gottstein objected to the expedited proceedings, saying the hearing was premature because to his knowledge Bigley had not yet been committed. It then emerged that Gottstein had not received notice of the court's May 5 commitment order. Gottstein also stated that he had yet to receive Bigley's medical chart despite earlier requests to API. He further argued that the API petition was defective because it did not provide adequate information about the proposal to medicate Bigley, such as the specific drugs, dosages, side effects, and benefits. He said that he needed this information to adequately prepare for the hearing.

Gottstein also proposed that a pretrial or settlement conference be held for the purpose of crafting a plan that would allow for an alternative to Bigley taking the medication. The court decided to proceed with the hearing and allow API to present its case, but said that it would make additional hearing time available for Gottstein to respond if necessary.

Early in the proceedings on the medication petition, Gottstein moved to dismiss, arguing that Bigley was competent earlier when he refused to take medications and that a less intrusive alternative existed of providing him support in the community to help him to function without medications. Gottstein also objected to the "compressed schedule" for the hearing, which he said would prevent him from adequately preparing his case. The court decided to allow API to proceed with its case, but asked Gottstein how much additional time he needed for his presentation and set aside additional time on May 14 for that purpose.

### a. Evidence on Bigley's capacity for informed consent

The court-appointed visitor, Marie Ann Vassar, testified she attempted to meet with Bigley that morning to assess his competence and found him "extremely agitated," delusional, and unable or unwilling to cooperate in an assessment. She said there was no evidence of an advance directive with regard to psychotropic medication. She also said that the guardian supported the use of such medication.

API presented the testimony of Dr. Lawrence Maile, director of API's forensic evaluation unit and its clinical director. He testified that he had treated Bigley on a number of prior occasions. He testified that Bigley's refusal to take medication was based on the delusional belief that API was trying to poison and kill him. Maile said that Bigley was not capable of having a rational conversation about the medications or understanding the proposed treatment. Bigley's counsel argued that on prior occasions, Bigley had while competent expressed opposition to taking medication and had ceased to take it after being discharged from the hospital, and that the court must abide by such statements of his preference.

The court concluded that Bigley was not now competent and that there was no evidence of any prior occasions on which Bigley had, while competent, stated an opposition to being medicated in the future. Bigley's own demeanor in the courtroom apparently influenced the judge's determination that Bigley lacked capacity. In her findings, the judge observed that Bigley "was quite agitated and maintained a running monologue throughout most of the court proceedings."

### b. Evidence relating to the best interests determination

With respect to the determination of Bigley's best interests, the main subjects of the evidence were (i) the benefits that API claimed the treatment would provide and (ii)

the harms that Bigley claimed would result from administering psychotropic medication.

### i. Evidence on benefits of administering psychotropic drugs

API proposed to treat Bigley with risperidone, an anti-psychotic medication that API records indicate had been part of an effective regimen in the past, and which, at the hearing, API doctors said helped make Bigley calmer and more capable of rational interaction so that he could function in the community. Dr. Kahnaz Khari, a staff psychiatrist at API, testified that the use of this kind of medication was required by the standard of care of psychiatrists in this community. She said she believed it was in Bigley's best interests to receive the medications.

Dr. Khari said it was likely Bigley would be injected since he refused to take the oral form of the drug. She also planned to administer a medication from the benzodiazepine family to calm Bigley down until the risperidone took effect. Dr. Khari conceded that Bigley was not likely to be compliant with medication after release. She said that as a result API favored giving him an injection that only has to be administered every two weeks: "At least that keeps him stable for some short period."

Dr. Khari said that she would expect that with medication Bigley might remain delusional, but with a lower level of intensity and a better ability to think rationally and engage with other people. She said that in the past, she had seen Bigley on medication and he was functioning better and living in an assisted living facility. "[H]e was able to have more rational interaction, and he wasn't labile. . . . So I have seen him in a higher quality of living standard that he can have with the medication versus when he's not on medication." She testified that without the medication, she was concerned he would "not be able to provide the care for himself, like not eating, not sleeping."

Dr. Maile, the API clinical director, also testified that Bigley would benefit from the drugs. He testified that when Bigley took medications, he was a "very different," "pleasant man" "who is not threatening and not at risk to generate the harm from others by his perpetual threats to them." Without medication, "he tends not to take care of himself. He doesn't eat, he doesn't drink, he doesn't seek appropriate medical care."

Dr. Maile testified that when not on his medications, Bigley tended to threaten people. For example, he said that Bigley had recently threatened to slit Maile's throat and kill his staff and their children. Dr. Maile expressed concern that someone Bigley encountered on the street might react to such threats by harming Bigley. This concern that Bigley might provoke an assault on himself was later reinforced by testimony from other witnesses, including one of Bigley's own witnesses.

The court-appointed visitor, Vassar, also testified that Bigley had in the past been helped by psychotropic drugs administered at API. She said that previously, there was a period, around 2003, 2004, or 2005, during which Bigley complied with the medication order as an outpatient, receiving medication every two weeks at API while living on his own in an apartment. She thought this period of stability had lasted a couple of years.

API's medical director, Dr. Raymond Hopson, gave similar testimony. He said that when Bigley agreed to take medication, he was "able to have suitable housing. And he was happy. He was not on the streets, and he was doing well at that time." However, in contrast to Vassar, Dr. Hopson said this recent period of stability under the influence of the medications had only lasted about six months. Dr. Hopson testified that without medications, Bigley was "intermittently homeless" and his "dietary intake is questionable" and that this "affects his overall health."

Bigley's witnesses portrayed the proposed treatment as just the latest in a repetitious cycle in which Bigley was committed and forcibly medicated without any real benefits. Dr. Grace Jackson, a psychiatrist called as an expert by Bigley, described the state's plan as "business as usual. And that is to continue sort of the in and out cycle of hospitalizations, revamping previous or new treatment plans, and then discharging, and then sort of repeating that process over again as it might

become necessary." API records indicate that even with medications, Bigley would remain delusional, although sometimes calmer.

Paul Cornils, a program manager for CHOICES, a social services nonprofit that had worked with Bigley, testified that it was "futile" to medicate Bigley because he would stop taking the medication as soon as he was released. Cornils also said Bigley had not been helped by the medication, saying the only effect he observed was sedation. He testified that with medication, "his delusions are as strong. His anger and aggression is still present, he just does not express them as strongly. He is less disturbing most of the time ... I have not noticed much difference except to say that his behavior is more socially acceptable when he's on medication." Cornils testified that there was no need for psychotropic medication and that providing Bigley with support and assistance would facilitate his return to a more stable, higher functioning state.

### ii. Evidence on harmful effects of psychotropic medications

The court heard evidence relating both to the perils of psychotropic drugs generally, and the specific side effects such drugs could have on Bigley himself.

Dr. Grace Jackson, the psychiatrist and author called by Bigley, testified as an expert witness about the harmful effects and lack of effectiveness of anti-psychotic drugs. Dr. Jackson conceded that psychotropic medication is widely accepted within the psychiatric community as an effective treatment for schizophrenia. However, she testified that the pharmaceutical industry had skewed and suppressed data showing the harms these drugs caused. She testified that the life expectancies of people taking drugs such as risperidone had shortened by as much as twenty to twenty-five years, that the drug caused many patients to be "chemically brain injured," and contributed to an "epidemic of dementia." She disputed the idea that risperidone was safer than the older drugs. She testified these drugs really should be called "chemical lobotomizers" rather than "antipsychotics" because they merely inhibit

brain activity to reduce "annoying behaviors." She testified that five to twenty percent of patients on risperidone will develop tardive dyskinesia symptoms in the first years of use.[3] She said she did not know if Bigley had tardive dyskinesia, but that he was at high risk of it if placed on risperidone. She also testified there was a "high likelihood he is simply just going to die in the next five years if he is placed back on risperidone."

In sharp contrast to the API doctors, Dr. Jackson believed that Bigley's recent decline in mental health had been caused not by his refusal to take medications, but to the contrary was the result of damage done by excessive medication. Dr. Jackson concluded that continuing with anti-psychotic medication for Bigley would be "very unwise."

Bigley also introduced an affidavit from Robert Whitaker, a journalist and author, describing evidence of the harmful effects and lack of efficacy of psychotropic drugs. And he introduced an affidavit from Ronald Bassman, Ph.D., an advocate and researcher who has been treated with psychotropic drugs for his own schizophrenia and now opposes their use.

Dr. Hopson of API disputed the assertion that treatment with anti-psychotics increases the likelihood of chronic mental illness. Dr. Hopson testified that Dr. Jackson's views were "not in the mainstream of clinical practice" in the Anchorage area. He said Alaska used treatment guidelines known as the Texas Medication Algorithm Project (TMAP) used in about half the states, which recommend anti-psychotic medications if the symptoms of schizophrenia interfere with daily functioning. He said it would be "remiss" not to treat someone like Bigley with such medications.

API did not dispute that Bigley has experienced some unpleasant side effects from psychotropic drugs in the past. Records from a 1981 hospitalization, when he was being treated with the drug Haldol, report extrapyramidal symptoms (EPS), i.e. movement dis-

---

**3.** *See supra* note 1.

orders.[4] More recently, during a 2007 hospitalization, his medications caused nausea and vomiting. Dr. Maile noted that Bigley had complained of some side effects from antipsychotic medication such as sleepiness and weight gain. The visitor said Bigley had complained of side effects of erectile dysfunction and sleepiness, as well as a belief that the injections had altered the shape of his buttocks. Both Dr. Maile and the visitor said they were not aware of Bigley having experienced the side effect of tardive dyskenisia.[5] However, the court later found, based on grounds that are not stated, that Bigley did in fact suffer from this condition as the result of years of treatment with anti-psychotic medications.[6]

Dr. Khari testified that the drug now at issue, risperidone, could have side effects such as sedation, hypertension, tardive dyskinesia, EPS, and hyperprolactinemia.[7] She said risperidone was a newer kind of antipsychotic with fewer side effects, but could have similar side effects to the older drugs at higher doses. She testified that in Bigley's case, the only side effects observed in the past from risperidone were weight gain and sedation.

### c. Testimony on Bigley's proposed less intrusive alternative

Before the hearing, Bigley's counsel had filed a "Motion for Less Intrusive Alternative" with the court. In it he proposed that Bigley "be allowed to come and go from API as he wishes, including being given food, good sleeping conditions, laundry and toiletry items as reasonably requested. . . ." If placed at API involuntarily, he proposed that Bigley be allowed out on passes with escort. Furthermore, the proposed alternative called for API to "procure and pay for a reasonably nice apartment that is available to Mr. Bigley should he choose to use it." Finally, he

proposed that API "make sufficient staff *available* to be with Mr. Bigley to enable him to be successful in the community." (Emphasis in original.)

In support of this motion, Bigley offered affidavits from Ronald Bassman, Ph.D., Robert Whitaker, and an affidavit and testimony from Paul Cornils. The affidavit from Whitaker, a journalist who writes about science and medicine, criticized the efficacy and side effects of psychotropic drugs, and argued that recovery rates are superior without them. The affidavit of Ronald Bassman described research supporting the efficacy of recovery from schizophrenia without drugs. A report submitted by Dr. Jackson also described non-drug treatment strategies and summarized studies supporting their efficacy.

Most directly relevant was the affidavit of Paul Cornils of CHOICES, because Cornils has worked with Bigley and specifically endorsed Bigley's proposed alternative, describing in some detail a theory of how Bigley could be better treated without psychotropic drugs. Cornils testified that his organization could provide case management and rehabilitative services in the community for someone in Bigley's condition. He thought that Bigley could be supported in the community without medication with the help of a twenty-four hours-a-day personal care attendant, which, over time, might be reduced to less than twenty-four hours.

Although Cornils objected to API's use of "coercion" to treat Bigley, he conceded that CHOICES lacked the funding to provide the kind of support Bigley needed. He also testified that CHOICES would not normally work with a patient who was refusing to take medication against his physician's recommendations, which could preclude CHOICES from working with Bigley. And he testified

---

4. These temporary muscular side effects disappear when the drug is terminated. *See Myers,* 138 P.3d at 241.

5. *See supra* note 1.

6. The record contains a transcript of a 2007 commitment proceeding involving Bigley in which Dr. William Worral, a former API physician, testified that Bigley had tardive dyskinesia

from years of treatment with other psychotropic drugs, but that the risk of this complication from risperidone was less than with those other drugs.

7. Hyperprolactinemia means "[e]levated levels of prolactin in the blood, which is a normal physiological reaction during lactation, but pathological otherwise. . . ." STEDMAN'S MEDICAL DICTIONARY 745 (25th ed.1990).

that a psychiatrist treating Bigley without medications would run a liability risk: "[T]he psychiatrist would ultimately be held responsible for the behavior because he is ultimately overseeing the treatment...."

API's Dr. Hopson agreed that the services recommended by Cornils would be valuable and that finding housing for Bigley should be a high priority. However, he said that the approach of treating Bigley without medication had been tried multiple times and failed because in each instance he was evicted from the housing due to his behavior. It had become difficult for his guardian to place him anywhere because "they know Mr. Bigley, and they know ... the difficulties they are going to encounter."

### 3. Post-hearing proceedings

On May 19, 2008, the superior court issued its findings and order granting the petition for approval of administration of medicine. The court found that Bigley lacked capacity to provide or withhold informed consent, that the administration of medication to him would be in his best interests, and that no less intrusive alternative was available to treat his mental illness.

Regarding Bigley's best interests, the court found that the proposed treatment met the standard of medical care in Alaska, and that without it Bigley is "unable at the present time to obtain any housing or mental health services outside of API because of his current aggressive and angry behavior." The court found that when medication had been administered in the past to Bigley, "his behavior has improved to such an extent that he has been able to successfully reside in the community, albeit for short periods of time." The court found that Bigley has experienced tardive dyskinesia, but that the risk was less with risperidone than with some other medications.

The court did not agree with Bigley's contention that there was a less intrusive alternative:

The option that Mr. Bigley simply be permitted to come and go from API as he chooses is not a realistic alternative for two reasons—first, it is inconsistent with API's role as an acute care facility for individuals throughout the state that are in need of acute mental health care, and second, the evidence is clear and convincing that Mr. Bigley would not avail himself of this option even if it were available to him. As such, it is not a less intrusive treatment at all.

Furthermore, the court found that without the administration of medication, "the evidence is clear and convincing that there will not be any improvement in Mr. Bigley's mental functioning." The court also noted that providing support services through CHOICES was not a viable alternative because Cornils of CHOICES testified that his organization could not work with a patient who refused treatment advice from a physician to receive medication.

The court approved API's petition, limiting approval to the specific drug risperidone in a specified dosage. However, its order was stayed pending an appeal to this court, and during that time Bigley's period of commitment expired and he was released without receiving the medication.

### III. STANDARD OF REVIEW

■ We review a trial court's factual findings for clear error.[8] Factual findings are clearly erroneous if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made.[9] We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony.[10]

■ We review a trial court's decision to grant or deny a continuance for abuse of discretion.[11]

■ We apply our independent judgment to the interpretation of the Alaska Constitu-

8. *Vezey v. Green,* 171 P.3d 1125, 1128 (Alaska 2007).

9. *Id.*

10. *Id.* at 1128–29.

11. *Klockenbrink v. State,* 472 P.2d 958, 964 (Alaska 1970).

tion and statutes, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[12]

## IV. DISCUSSION

### A. The Appeal Is Moot but We Decide It Under the Public Interest Exception.

 We generally refrain from deciding issues where the facts have rendered the legal issues moot.[13] This case is technically moot because Bigley can no longer be medicated under the challenged order and therefore cannot obtain any relief if he prevails.[14] The order permitting API to medicate Bigley was stayed pending an appeal to this court. Bigley's period of commitment subsequently expired and he was released without receiving the medication. A claim is moot if "it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails." [15]

 However, a "public interest exception" may apply when a potentially moot case raises a matter that is (1) "of grave public concern," (2) likely to recur, and (3) "capable of evading review." [16] In *Myers v. Alaska Psychiatric Institute*, we noted that the involuntary administration of psychotropic medication by the state is a "highly intrusive" procedure implicating "fundamental constitutional guarantees of liberty and privacy." [17] In that case, we found the public interest exception to apply in order to clarify the requirements for protecting constitutional rights in such proceedings.[18] For similar reasons, the public interest exception applies here. Bigley raises issues of public importance regarding the application of the *Myers*

standards, as well as questions of due process and interpretation of the underlying statutory scheme in such proceedings.

As in *Myers*, these issues are likely to recur.[19] This is true not only because other patients are likely to raise similar claims in the future, but because Bigley himself, having already been involuntarily committed and medicated dozens of times in the past,[20] is almost certain to face similar proceedings in the future. Finally, as we noted in *Myers*, "it is doubtful that an appeal from a medication order could ever be completed within the order's period of effectiveness." [21] Thus, the petition in this case, like the one in *Myers*, is of a kind that is likely to evade review.[22] We conclude that while technically moot, this case raises issues that are justiciable under the public interest exception.

### B. It Was Error To Deny Bigley Adequate Notice and Opportunity To Prepare His Case.

Bigley argues that the court violated his due process rights, claiming he was (1) denied sufficient advance notice of the nature of the proceedings, (2) not given adequate time to prepare his case, and (3) denied timely access to his medical chart ahead of the hearing. We will examine each of these claims in turn, but first consider the structure of state laws that govern the administration of psychotropic medication.

 The state may not administer such medication to a patient in a non-crisis situation unless the patient provides informed consent, authorizes the administration of such medication in an advance directive, or is

**12.** *Vezey*, 171 P.3d at 1129.

**13.** *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 244 (Alaska 2006) (citing *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985) and *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971)).

**14.** *See infra* pp. 187–88 regarding Bigley's claim that he is entitled to a remedy of having this court order provision of his proposed less intrusive alternative.

**15.** *Fairbanks Fire Fighters Ass'n v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002).

**16.** *Myers*, 138 P.3d at 244 (quoting *Hayes*, 693 P.2d at 834).

**17.** *Id.* at 242, 250.

**18.** *Id.* at 245.

**19.** *See id.* at 244–45.

**20.** *See supra* note 2.

**21.** *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 244 (Alaska 2006).

**22.** *See id.* at 244–45.

determined by a court to lack the capacity to give informed consent.[23] In the latter circumstance, the state must prove that the patient is unable to give or withhold informed consent and prove by clear and convincing evidence that the patient never previously made a statement while competent that reliably expressed a desire to refuse such treatment in the future.[24] The governing statute provides that this hearing must be held within seventy-two hours after the filing of the petition by the state.[25] Under the standards we announced in *Myers,* constitutional guarantees of liberty and privacy further require the court to find by clear and convincing evidence that the involuntary administration of psychotropic medication is in the best interests of the patient and that no less intrusive alternative treatment is available.[26]

The right to refuse psychotropic medication is a fundamental right protected by the Alaska Constitution's guarantees of liberty and privacy.[27] We held in *Myers* that such involuntary medication cannot be ordered unless a court finds by clear and convincing evidence that the treatment is in the best interests of the patient.[28] The *Myers* court provided guidance on factors that should be considered in the best interests determination.[29] "At a minimum, . . . courts should consider the information that our statutes direct the treatment facility to give to its patients in order to ensure the patient's ability to make an informed treatment choice. As codified in AS 47.30.837(d)(2), these items include":[30]

(A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;

(B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;

(C) a review of the patient's history, including medication history and previous side effects from medication;

(D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment[.] [31]

We have stated that these factors are "crucial in establishing the patient's best interests," [32] which means that their consideration by the trial court is mandatory. We will here refer to these as the *"Myers* factors." Our opinion in *Myers* also identified a set of factors derived from a ruling of the Supreme Court of Minnesota.[33] They are:

(1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment;

(2) the risks of adverse side effects;

(3) the experimental nature of the treatment;

(4) its acceptance by the medical community of the state; and

(5) the extent of intrusion into the patient's body and the pain connected with the treatment.[34]

We called these Minnesota factors "helpful" and "sensible," [35] which means that to the extent they differ from the *Myers* factors,

23. AS 47.30.836.

24. AS 47.30.839(d)-(g).

25. AS 47.30.839(e).

26. *Myers,* 138 P.3d at 249–50.

27. *Id.* at 248.

28. *Id.* at 239, 252–53.

29. *Id.* at 252.

30. *Id.*

31. *Id.*

32. *Id.*

33. *Id.* (citing *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905, 913 (1976)).

34. *Id.*

35. *Id.*

their consideration by Alaskan courts is favored but not mandatory.

■ Alaska has adopted the U.S. Supreme Court's three-part balancing test from *Mathews v. Eldridge*[36] for determining the necessary extent of due process:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[37]

Applying due process principles to notice requirements, we have held that the notice of a hearing must be "appropriate to the occasion and reasonably calculated to inform the person to whom it is directed of the nature of the proceedings."[38] Due process also requires that a respondent has "a reasonable opportunity to prepare."[39]

With this statutory and constitutional framework in mind, we consider each of Bigley's due process arguments.

### 1. Bigley had a due process right to sufficient notice of the nature of the proceedings.

■ Bigley argues that he was denied due process because he did not have sufficient notice of which drugs API proposed to administer to him, and was not informed of the evidence API intended to present in order to comply with standards announced in our *Myers* ruling. We agree.

The petition used by API in this case merely stated its intent to administer psychotropic medication without any other information about the nature of the proposed treatment or its justification.[40] Such notice will generally be insufficient to allow a respondent such as Bigley a reasonable opportunity to prepare his case.[41]

■ With respect to this function of providing notice, the petition here is somewhat analogous to a complaint in a civil case or an indictment in a criminal case. In civil cases, Alaska has a fairly lenient "notice pleading" standard. Alaska Rule of Civil Procedure 8(a) requires that a complaint include "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." We have noted that "[w]e have not construed this rule to require details of evidence that a claimant will offer to establish a claim; to the contrary, we have emphasized that the rule is satisfied by a brief statement that 'give[s] the defendant fair notice of the claim and the grounds upon which it rests.'"[42] In criminal cases, "[t]he fundamental purposes of the indictment are to furnish the accused with a description of the charge against him to enable him to prepare his defense."[43] Alaska Rule of Criminal Procedure 7(c) provides that "[t]he indictment or the information shall be a

36. 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

37. *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1135 (Alaska 2001) (citing *Mathews*, 424 U.S. at 335, 96 S.Ct. 893).

38. *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380 (Alaska 2007) (quoting *Huntley v. N. Carolina State Bd. of Educ.*, 493 F.2d 1016, 1019 (4th Cir.1974)).

39. *Id.* (quoting *French v. Blackburn*, 428 F.Supp. 1351, 1357 (M.D.N.C.1977)).

40. The standardized petition form used by API has no explanation of the basis or goals of the petition, other than the text beside two check boxes that were marked. One checked part states, "There have been, or it appears that there will be, repeated crisis situations requiring the immediate use of medication to preserve the life of, or prevent significant physical harm to, the patient or another person. The facility wishes to use psychotropic medication in future crisis situations." The text beside the other selected check box states, "Petitioner has reason to believe the patient is incapable of giving or withholding informed consent. The facility wishes to use psychotropic medication in a noncrisis situation."

41. *See Wetherhorn*, 156 P.3d at 380.

42. *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 673 (Alaska 2002) (internal citations omitted).

43. *Thomas v. State*, 522 P.2d 528, 530 (Alaska 1974).

plain, concise and definite written statement of the essential facts constituting the offense charged."

■ When the state seeks the involuntary administration of psychotropic medication in a non-crisis situation, it similarly must provide a plain, concise, and definite written statement of the facts underlying the petition, including the nature of and reasons for the proposed treatment, in order that the respondent may prepare, if he or she desires, to challenge the petition under the *Myers* factors. This should include information about the patient's symptoms and diagnosis; the medication to be used; the method of administration; the likely dosage; possible side effects, risks and expected benefits; and the risks and benefits of alternative treatments and nontreatment.

This conclusion is supported by the balancing test of *Mathews v. Eldridge.* First, the private interest here is very strong, given the highly intrusive and potentially harmful effects of involuntary administration of psychotropic drugs. Second, the risk of an erroneous deprivation of individual rights is high, since the subject of the hearing is alleged to be mentally incompetent and will inevitably rely heavily upon counsel who may have imperfect knowledge concerning the case. The value of providing such information would be high, since it goes to the heart of the constitutional inquiry into the patient's best interests under *Myers.* The government too has a strong interest at stake, namely the expeditious treatment of a person alleged to be suffering a serious mental illness. But the administrative burden of providing such notice should not be unduly high, since these are all factors the state would need to consider in reaching the decision that it is necessary to medicate the patient in the first place.

In this particular case it is not clear Bigley was actually prejudiced by the lack of notice. He had been through similar proceedings with API in the past and knew enough about the proposed treatment to mount a vigorous challenge to the petition. Nevertheless, it is possible that his presentation of his case under the *Myers* best interests factors could have been compromised. Accordingly, we decline to render an opinion here about whether API met its burden of showing by clear and convincing evidence that the proposed treatment was in Bigley's best interests. Nor will we remand for additional proceedings, since this case is technically moot. API no longer seeks to medicate Bigley under the challenged order, so there would be no remedy if Bigley could show on remand that the proposed treatment was not in his best interests under the *Myers* factors.[44]

**2. The amount of preparation time did not violate Bigley's due process rights, but the court had discretion to wait longer than seventy-two hours to hold the hearing.**

■ Bigley argues that an expedited hearing gave him inadequate time to prepare his case. In particular, he says the schedule did not allow time to subpoena Dr. William Worrall, a former API physician he needed to testify. He also says he lacked sufficient time to prepare his case with respect to the proposed less intrusive alternative. Although we agree with Bigley that the trial court had discretion to postpone the hearing, we conclude nevertheless that the timing of the hearing did not constitute a due process violation because there is no indication the scheduling of the hearing prejudiced the preparation of Bigley's case.

API argues that Bigley had ample notice because he was aware there was a petition for court-ordered medication by the date of the commitment hearing, April 30, and received notice of that proceeding by April 29. API also notes that the medication hearing spanned three days, May 12, 14, and 15, and that the judge made accommodations to give Bigley extra time to present his case at his request.

■ We have held that granting or denying a continuance is within the discre-

---

**44.** Regarding Bigley's argument that he is entitled to the remedy of ordering provision of the

less intrusive alternative, *see infra* pp. 187–88.

tion of the trial judge, and we will consider the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion.[45] Denial of a motion for continuance constitutes an abuse of discretion "when a party has been deprived of a substantial right or seriously prejudiced."[46] It is the "duty of the trial judge, in the absence of some weighty reason to the contrary, to insist upon cases being heard and determined with as great promptness as the exigencies of the case will permit."[47]

In this case there is no indication that the schedule of these proceedings prejudiced Bigley. API's medication and commitment petitions were both filed on April 28. Bigley's attorney Gottstein appeared at Bigley's commitment hearing on April 30, 2008 and filed a limited entry of appearance so as to represent Bigley regarding the petition for court-ordered administration of medication. On May 5 the court ordered Bigley committed. On May 7 API moved for an expedited hearing on the medication petition. On May 9 (Friday) the court gave notice to the parties that it was going to hold an expedited hearing on the medication petition on May 12 (Monday). At the May 12 hearing on the medication petition, Gottstein objected to the expedited schedule, saying the hearing was premature because to his knowledge Bigley had not yet been committed. It then emerged that Gottstein had not received notice of the court's May 5 commitment order.

We are not persuaded by Bigley's argument that he was prejudiced by not having more time to investigate instances in which API funded additional services in the community of the kind that Bigley sought under his less intrusive alternative. This was not a disputed issue: API's witnesses stated that they believed it was valuable to provide supportive services to help Bigley live in the community, and that they hoped such services could again be provided in the future. However, they also clearly believed that successful provision of any such services first required Bigley to be treated with psychotropic medications, and that Bigley needed a combination of medication and these supportive services. The judge's findings echoed this.

Viewing the issue in the due process framework of *Mathews v. Eldridge*,[48] the court needed to balance the potential infringement of Bigley's rights against the probative value of additional time and the impact of delay in relation to the government's interests.[49] The trial judge stated that she was "fully cognizant" of the need to give due consideration to the *Myers* requirements and observed that she took these types of proceedings "quite seriously." While the amount of time needed to prepare for such a hearing may vary with circumstances, the government will usually have a strong interest in a speedy decision in order to render treatment to a mentally incapacitated person. In this case, API had a limited window of time to administer medication during Bigley's thirty-day commitment, and in committing Bigley, the court had found that Bigley was gravely disabled. Given the circumstances and the lack of any indication that Bigley was prejudiced by delay, we do not find that the amount of preparation time violated his due process rights.

■ Bigley also argues that the court refused to delay the hearing because it erroneously interpreted the governing statute as requiring that the hearing be held within seventy-two hours of the filing of the medication petition by API. We agree with Bigley's interpretation of the statute on this point.

**45.** *See A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999).

**46.** *Siggelkow v. Siggelkow*, 643 P.2d 985, 986–87 (Alaska 1982) (quoting *Barrett v. Gagnon*, 516 P.2d 1202, 1203 (Alaska 1973)).

**47.** *Id.* at 987 (quoting *Kalmus v. Kalmus*, 103 Cal.App.2d 405, 230 P.2d 57, 63 (1951)).

**48.** 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**49.** *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1135 (Alaska 2001) (citing *Mathews*, 424 U.S. at 335, 96 S.Ct. 893).

Alaska Statute 47.30.839(e) provides that the court must hold a hearing within seventy-two hours of the filing of the medication petition in order to "determine the patient's capacity to give or withhold informed consent ... and the patient's capacity to give or withhold informed consent at the time of previously expressed wishes regarding medication...." Bigley argues that the statutory language only explicitly requires a hearing within seventy-two hours on the issues of informed consent and capacity. The statute is silent on the timing of the constitutionally-mandated inquiry under *Myers* into the patient's best interests and the availability of a less intrusive alternative. The trial court held that all these matters must be determined within seventy-two hours of the petition.

A literal reading of the statute does not require that these inquiries into best interests and less intrusive alternatives be conducted within seventy-two hours of the petition. This is unsurprising because those requirements were imposed by the *Myers* ruling after the statute was enacted and were very likely not contemplated by the legislature at all. Determining whether the treatment is in the patient's best interests and whether less intrusive treatment alternatives are available requires a broader inquiry than merely determining capacity and informed consent. It seems likely there would be circumstances in which a seventy-two hour time limit would not give sufficient time for the respondent to prepare for such a hearing and thus violate due process.

The canon of constitutional avoidance recommends that "when the validity of an act of the [legislature] is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle ... [to] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." [50] Because AS 47.30.839(e) is ambiguous, and because an interpretation that imposes a rigid seventy-two hour limit may in some circumstances violate due process, we hold that the statute should be interpreted as offering the court the discretion to conduct a separate proceeding on the constitutional questions required by *Myers* that does not occur within seventy-two hours of the medication petition.

### 3. Bigley had a due process right to access his medical chart before the hearing.

■ Bigley was represented by the Public Defender Agency during the involuntary commitment proceeding, and by attorney Gottstein during the proceedings on the medication petition. The public defender and Bigley's guardian contested this bifurcation of Bigley's representation. The magistrate at the April 30, 2008 commitment hearing ruled that Gottstein could represent Bigley in the later medication petition proceeding but could not serve as his counsel until the commitment proceedings were completed and Bigley was committed. According to Gottstein, as a result of this decision, he didn't get access to Bigley's medical chart "until after the hearing started, and then only to a portion of it."

Attorney Gottstein did not receive Bigley's medical chart before the May 12 hearing, even though he requested it and the court had earlier approved his representation of Bigley on this matter. The chart should have been provided earlier. Gottstein needed access to his medical history to prepare for proceedings regarding his best interests and alternative treatments under the *Myers* standards. That the court did not intend to proceed on the medication petition until Bigley was committed does not lessen Bigley's need for sufficient time to prepare for that proceeding. Providing Bigley with the medical chart on the day of the hearing was not sufficient to satisfy due process.

Again, this is a matter that is technically moot in this case, since Bigley was released without the medication order ever being carried out. However, we hold that a patient must have access to his medical and psychiatric records once a petition to involuntarily medicate the patient has been filed. Furthermore, there is no need to wait until the

**50.** *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465–66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

commitment proceeding is completed to provide this information to an attorney who will be representing the patient in a subsequent medication proceeding.

### C. The Court Did Not Err in Finding by Clear and Convincing Evidence that There Was No Less Intrusive Alternative to the Ordered Treatment.

Bigley argues that because there was a less intrusive alternative to involuntary medication, it was unconstitutional to approve the medication petition. We conclude that the trial court did not err in finding by clear and convincing evidence that the alternative proposed by Bigley was not a feasible alternative for achieving the state's compelling objectives.

In *Myers* we held that "[w]hen no emergency exists, . . . the state may override a mental patient's right to refuse psychotropic medication only when necessary to advance a compelling state interest and only if no less intrusive alternative exists." [51] This finding must be supported by clear and convincing evidence. [52] The inquiry into whether there is a less intrusive alternative is a mixed question of fact and law. It involves, in part, a balancing of legal rights: "In cases involving the right to privacy, the precise degree to which the challenged legislation must actually further a compelling state interest and represent the least restrictive alternative is determined, at least in part, by the relative weight of the competing rights and interests." [53] In cases such as this, we must balance the fundamental liberty and privacy interests of the patient against the compelling state interest under its *parens patriae* authority to "protect 'the person and property' of an individual who 'lack[s] legal age or capacity.' " [54]

While this inquiry involves a balancing of legal rights and interests, it is also a fact-intensive inquiry. Although the state cannot intrude on a fundamental right where there is a less intrusive alternative, the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action. [55] Assessing the feasibility and likely effectiveness of a proposed alternative is in large part an evidence-based factual inquiry by the trial court.

As described earlier, Bigley proposed as a "less intrusive alternative" a plan under which he would "be allowed to come and go from API as he wishes, including being given food, good sleeping conditions, laundry and toiletry items as reasonably requested . . . ." If placed at API involuntarily, he proposed that he be allowed out on passes with escort. Furthermore, the proposed alternative called for API to "procure and pay for a reasonably nice apartment that is available to Mr. Bigley should he choose it." Finally, Bigley called for API to "make sufficient staff *available* to be with Mr. Bigley to enable him to be successful in the community." (Emphasis in original.)

API did not dispute that Bigley's proposed alternative was less intrusive than API's proposal, which the judge termed "highly intrusive." We agree that Bigley's proposed alternative was less intrusive because it did not require Bigley to take drugs that he opposes taking. However, the court was required to evaluate whether Bigley's proposed alternative would be feasible and effective in promoting the same compelling state interests that justified API's proposed treatment.

51. *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006).

52. *Id.* at 254.

53. *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 581 (Alaska 2007).

54. *Myers*, 138 P.3d at 249 (quoting *Pub. Defender Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 949 (Alaska 1975)).

55. *See Treacy v. Municipality of Anchorage*, 91 P.3d 252, 267 (Alaska 2004) (proposed alternative to youth curfew that would limit the restrictions to those youths who had violated the law in the past would not meet the ordinance's stated purpose of protecting juveniles from becoming crime victims themselves); *see also Planned Parenthood*, 171 P.3d at 579, 585 (parental notification is an alternative to parental consent requirement for minors seeking abortion because it will serve equally well to promote the Parental Consent Act's goals of involving parents in their minor children's abortion decisions).

When the state petitions for involuntary administration of psychotropic medication, the relevant compelling interest is the state's *parens patriae* power, the "inherent power and authority of the state to protect 'the person and property' of an individual who 'lack[s] legal age or capacity.' "[56] The trial court fairly described the state as pursuing the goals of "improvement in Mr. Bigley's mental functioning" and helping him to "function in the community." As to the state's proposed administration of psychotropic medication, the superior court found that

> When medication has been administered in the past to Mr. Bigley, his behavior has improved to such an extent that he has been able to successfully reside in the community, albeit for short periods of time. Without the administration of medication at this time, the evidence is clear and convincing that there will not be any improvement in Mr. Bigley's mental functioning.

The record supported this conclusion.

Regarding the comparative effectiveness of the medication approach and Bigley's proposed less intrusive alternative, Bigley's witnesses testified that psychotropic medications were often ineffective, and that non-drug treatments would be more effective. On the other hand, API doctors and the visitor testified that in the past the drugs had calmed Bigley and made him more rational and better able to function in the community. They asserted that Bigley needed the medication in order to be able to attend to his basic survival needs for housing, nutrition, and medical care.

It is true that the record provides ample reason to doubt that API's proposed treatment will provide permanent or long-term gains in Bigley's well-being. He has already been a patient at API at least sixty-eight times, and has repeatedly stopped taking medication and deteriorated after release. As the visitor once noted, Bigley's course has been a "revolving door" of hospitalizations, treatment, release, and further hospitalization. The superior court concedes that in the past, the administration of psychotropic medication has only yielded improvements in Bigley's quality of life for "short periods of time."

Although this is a rather limited endorsement of API's treatment plan, the court concluded that the administration of the medication offered the best prospect for helping Bigley to cooperate with further treatment and obtain further assistance in gaining housing and other services. The court did not believe Bigley's proposed alternative would achieve these benefits. It noted that without the medication, Bigley will be "unable ... to obtain ... mental health services outside of API because of his current aggressive and angry behavior." Therefore, "in order for Mr. Bigley to be most likely to achieve a less restrictive alternative than his current placement at API, the involuntary administration of risperadone is needed." For example, Bigley argues his mental condition would improve if he were offered housing at API, but the judge concluded that "Mr. Bigley would not avail himself of this option even if it were available to him. As such, it is not a less intrusive treatment at all." The court noted that due to his "aggressive and angry behavior," Bigley has been evicted from other housing options he was provided in the past. Furthermore, the court concluded that without administration of the medication, Bigley was not "likely to achieve a less restrictive alternative than his current placement at API."

The court also concluded, after hearing the evidence on both sides, that Bigley's proposed alternative faced practical obstacles to being implemented at all. Bigley seeks for API to allow him to use its hospital as his place of residence, and provide him with intensive twenty-four hour a day assistance to help him cope with his daily needs and keep him out of trouble. The court found this proposal to conflict with API's mission as the state's only acute care psychiatric hospital. The court heard testimony from API's medical director that it was incapable of housing patients like Bigley on a long-term basis without compromising its primary mission.

---

**56.** *Myers,* 138 P.3d at 249 (quoting *Pub. Defender Agency,* 534 P.2d at 949).

Bigley's proposal also relied on the notion that API or some other service provider such as CHOICES would offer Bigley intensive case management and assistance in the community, including twenty-four hour-a-day care to keep him out of trouble. However, the court noted that Paul Cornils of CHOICES was not sure his organization would be able to assist Bigley even if it had funding to do so, as long as Bigley were not following treatment advice to receive medication. API physicians testified that not prescribing the medication would violate the standard of care in Alaska. Thus, as Cornils acknowledged, it could be difficult to find any physician or social service providers willing to treat Bigley without first medicating him. Implementation of Bigley's proposal would evidently require physicians and service providers to care for Bigley in ways that violate their own professional standards, to say nothing of the risks to Bigley if the alternative proved ineffective as the court feared.

The superior court found that Bigley's proposed alternative would not likely provide Bigley with the needed therapeutic benefits, and that API's proposed use of medication offered a better chance of improving Bigley's functioning and helping him to address his basic needs. These findings were not clearly erroneous. Similarly we do not find the trial court to have clearly erred in finding the proposed less intrusive alternative posed serious risks to Bigley's well being, and that there were major practical obstacles to its implementation.

█ In weighing the evidence for and against the availability of a less intrusive alternative, the trial court is required to find by clear and convincing evidence that no less intrusive alternative is available. We have described clear and convincing evidence as "evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt. . . . '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be

proved.'"[57] We conclude that the evidence heard by the trial court was strong enough to meet this standard. We therefore find the court did not err in concluding that there was no less intrusive alternative available than API's proposed treatment.

### D. We Are Unable To Determine Whether There Was Clear and Convincing Evidence that Administration of Psychotropic Medication Was in Bigley's Best Interests.

█ The right to refuse psychotropic medication is a fundamental right protected by the Alaska Constitution's guarantees of liberty and privacy.[58] We held in *Myers* that such involuntary medication cannot be ordered unless a court finds by clear and convincing evidence that the treatment is in the best interests of the patient.[59] Bigley asserts that the trial court erred in making this finding. We have determined in this case that Bigley did not receive adequate notice of the nature of API's treatment proposal and was denied access to information needed to prepare his case under the *Myers* best interests factors.[60] While it is possible that these due process violations constituted harmless error, it is also possible that they deprived Bigley of the opportunity to properly develop his case on best interests.

Because API no longer seeks to carry out the treatment proposed in the disputed petition, the question of best interests is moot and no purpose would be served by remanding for new proceedings on it. Bigley argues that a remedy is still available because we could order the lower court to provide his proposed less intrusive alternative. However, the best interests and least intrusive alternative inquiries under *Myers* are parts of a constitutional test of the validity of API's proposed treatment. If that *Myers* inquiry had lead us to conclude that API's proposed treatment was constitutionally barred, that would not give rise to a legal obligation on API's part to provide Bigley's less intrusive

**57.** *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994) (quoting *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249, 253 (1984)).

**58.** *Myers*, 138 P.3d at 246, 248, 251–52.

**59.** *Id.* at 239, 249–50, 252.

**60.** *See supra* pp. 180–82.

alternative. API could attempt to offer some other form of treatment that was not constitutionally invalid, or could simply release Bigley without treatment (which is what happened in this case). Accordingly, we decline to review the sufficiency of the evidence supporting administration of psychotropic medication in this case.

## V. CONCLUSIONS

Because we address this appeal under the public interest exception to the mootness doctrine, we issue only declaratory relief. We hold that in proceedings for involuntary administration of psychotropic medication in non-crisis situations, due process requires that the petition provide sufficient information about the proposed treatment plan for the respondent to prepare to challenge the petition under the *Myers* best interests factors, should he or she wish to do so. The respondent must also be given access to his or her psychiatric and medical records held by the petitioner in advance of the hearing. We also hold that AS 47.30.839(e) should be interpreted to give courts discretion to wait more than seventy-two hours to hold hearings on the best interests and less intrusive alternative inquiries mandated by our *Myers* ruling if the respondent requests more time. Finally, we hold that in this case the superior court did not err in rejecting Bigley's proposed less intrusive alternative to involuntary medication.