*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17810 |
| JONAS H., | ) ) ) ) ) ) | Superior Court No. 3AN-20-00831 PR  O P I N I O N  No. 7607 – July 22, 2022 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: George W. P. Madeira, Jr., Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Jonas H. Anna Jay, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

CARNEY, Justice.

## I. INTRODUCTION

A man appeals superior court orders authorizing his involuntary commitment for mental health treatment and the involuntary administration of psychotropic medication, asking us to vacate both orders. He argues that the superior court relied on erroneous facts to find that he was gravely disabled and that the court did not adequately consider the constitutional standards established in *Myers v. Alaska*

*Psychiatric Institute* before authorizing medication.[1]  Because the evidence supports the court's finding that the man was gravely disabled, we affirm the commitment order.  But we vacate the medication order because the court's analysis of the *Myers* factors was not sufficient.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In April 2020, Jonas's[2] mother petitioned the superior court to order her son hospitalized for evaluation of his mental health.  She wrote in the petition that he had been diagnosed with schizophrenia in 2002 and that his illness had been successfully controlled by medication until he stopped taking it in 2015.  Jonas's mother asserted that he "ha[d] progressively gotten worse" and was "[u]nable to take care of his basic needs."  The superior court granted the petition the next day, and Jonas was transported to the Alaska Psychiatric Institute (API) for evaluation.  A few days later, API filed petitions requesting an order to commit Jonas to API for 30 days and an order authorizing API to involuntarily administer psychotropic medication to Jonas.

### B.    Proceedings

In early May, a superior court master held two separate hearings to address the commitment and medication petitions.  The court first addressed the commitment petition.  Jonas's mother testified about his deteriorating condition.  She testified that Jonas's behavior had become "much more erratic" in the past year, he had threatened his father with a knife, and he had started sending her alarming emails.  While she once had contact with Jonas every other week, he had largely stopped communicating with her, and she had become afraid to go to his apartment.  On the day she filed the petition, she

---

[1]    138 P.3d 238 (Alaska 2006).

[2]    We use a pseudonym to protect Jonas's privacy.

went to his apartment with two police officers, but Jonas did not answer the door. She said she went inside the apartment because she "was afraid that he had killed himself." She testified she was "shocked" because there were "[h]oles in every door[,] . . . holes punched in every wall, [and] garbage everywhere," as well as signs that Jonas had lit fires inside the apartment.

Jonas's mother also testified that she and other family members did not feel safe around Jonas. In response to questioning, she explained that she deposited money into Jonas's account every month and paid for his apartment but that she would not lease a different apartment for Jonas because she was afraid of the damage he would do. She stated that she did not believe Jonas could provide food or housing for himself if she did not help him, that he had a car but he would not use it, and he had taken apart his cell phone. And she was not aware of any friends and family who would be willing to help him.

The State then called Jonas's treatment provider from API. She testified that Jonas had one prior admission to API and had been diagnosed with schizoaffective disorder, bipolar type. She testified Jonas was "acutely psychotic," "exhibit[ed] manic symptoms," and had "delusion[s]" such as "believing he [was] God" and "that [his] food [was] drugged." The treatment provider testified that "the severity of his delusions" would "affect his ability to care for himself" and that because he had "no insight into his mental illness . . . he probably [wouldn't] be able to . . . find help if he need[ed] it." She stated that Jonas's mental illness would interfere with his ability to keep himself safe if he were released. Jonas interrupted her testimony, asserting, "I actually am the Lord. I actually am God. I have to deal with a lot . . . . But it doesn't mean that it's a disorder. A lot of people have intense spiritual lives."

The provider testified that Jonas told her he wanted a new apartment because the current one was "cursed." She had been unable to discuss the process for

obtaining a new apartment with Jonas because "usually[] the conversation [went] into a tangent about religion." She acknowledged that at API Jonas had been eating all of his meals, had not acted in a violent or unsafe manner, and had been having appropriate interactions with his peers. But she believed he was doing well because API provided his food and prompted him to eat, shower, and socialize. She believed that his condition could improve if he stayed at API and took his medications.

When asked where he would go if he were released from API, Jonas testified:

> I would . . . go to my address to gather my things. And then I would sort it out from there. I'm not too worried about such things actually. I know there's a shelter. I've actually stayed at the shelter a few nights before when I got locked out of my house . . . .

He also testified that he was "not worried about walking overnight" and could buy groceries at a gas station.

Jonas testified that his mother had not provided him enough money to live on and that she was cruel to him. He also declared that he "would definitely leave" his apartment because it was cursed and "the curse is tied to the premise[s]." He stated he was getting "a lot more rest" at API "because the house is cursed." When asked what he would do if released, he responded, "I cannot predict the future like this. You're asking me to do something that I'm incapable of doing at this time. I think it's ridiculous."

The master made findings on the record. The master found that Jonas's mother had testified she could not provide him an apartment any longer, "especially given the condition that the last apartment was left in." And the master found that Jonas was "very intelligent and very articulate" but had been so focused on "curses and religion," he was not able to discuss "basic discharge planning . . . even when it was

rephrased in a very simple fashion." The master concluded that Jonas was mentally ill and gravely disabled, and recommended granting the commitment petition.

The master held a hearing on the medication petition the following day. The court visitor[3] testified that Jonas was "oriented in all spheres" but that Jonas denied having a mental illness and believed instead that he was "being spiritually attacked." She testified that Jonas had both reasonable and unreasonable objections to medication. Jonas told the visitor that the medication was unhelpful and caused several negative side effects, which the court visitor believed were reasonable objections. But she also stated Jonas had unreasonable objections that the medications made him feel he was "about to . . . enter into death" and left him "spiritually threatened"; he also believed that the doctors were "trying to overprescribe him." The court visitor testified that Jonas "exhibited pressured speech," an irrational thought process, and a concern that "people [were] trying to harm him through the administration of medication." The court visitor also testified that Jonas's mother had said while Jonas was living with her, he recognized he needed treatment and had been taking Seroquel. But his mother told her that after he moved out he had stopped taking medication and decompensated. She concluded that Jonas did not have the capacity to give informed consent.

Jonas's treatment provider again testified. She clarified that although the medication petition contained multiple medications, she would prescribe only one mood stabilizer and one antipsychotic medication at a time. She explained the medications and dosages and how possible side effects would be treated. She testified that she had not been able to have a reasonable conversation with Jonas because he claimed to have "been on all of these medications before" but was "very nonspecific about what he's taken,

---

[3] The court must appoint an independent visitor to investigate whether the respondent to an involuntary medication petition has capacity to give or withhold informed consent to administration of medication. AS 47.30.839(d).

what the side effects may have been. So there really is no history."

The provider testified that it was "very important" for Jonas to receive treatment and that his treatment needs could not be met without medication. She believed the proposed medication plan was in his best interest because "without medication, there . . . [was] no chance" that he would improve. She also stated that Jonas's symptoms were too severe to be treated with just one medication, even one that could act as both a mood stabilizer and an antipsychotic.

Jonas testified that he had taken every medication listed in the petition "extensively." And although he was "desperate to get rid of [his] condition," the medications and side effects "made [him] more dysfunctional than functional." He testified that he had tried to find psychologists to help him, but because they did not have similar religious beliefs they were unable to understand what was psychosis and what was religion. And he testified that he was not mentally ill, that it was "a spiritual phenomenon" and "not really a problem with the mind."

The State argued that Jonas was not competent to consent to a medication plan because he lacked capacity[4] due to his failure to appreciate that he had a mental illness, and that medication was in his best interests because he would otherwise "decompensate and get worse." The State further argued that Jonas did not have capacity to make an informed decision, because he was not rational about his treatment plan despite being intelligent and well-spoken. Jonas urged the court to deny the petition because he had clearly articulated his reasons for not taking medication. The master

---

[4]     *See* AS 47.30.837(d)(1) (defining "competent" for purpose of patient giving informed consent to medication as "(A) has the capacity to assimilate relevant facts . . . ; (B) appreciates that the patient has a mental disorder or impairment . . . ; (C) has the capacity to participate in treatment decisions by means of a rational thought process; and (D) is able to articulate reasonable objections to using the offered medication").

found by clear and convincing evidence that Jonas was not competent to provide informed consent, medication was in his best interests, and there was no less intrusive alternative.

The superior court adopted the master's recommendations and granted the petition for the 30-day commitment to API and the petition for involuntary administration of psychotropic medication. In its commitment order, the court concluded that Jonas was mentally ill and gravely disabled. It found his mother's testimony and photographic evidence credible and described "the state of the apartment . . . including enormous amounts of garbage laying around, dirty pots and pans, burn marks to walls in the kitchen, and extensive damage to doors and walls."

The superior court also concluded that involuntary medication was in Jonas's best interests because the medications were FDA-approved and the treatment provider explained that "the benefits of these medications . . . outweigh the minimally anticipated risks." The court found the treatment provider's testimony credible that Jonas's condition was "currently untreated and so acute that if he was released, he would have no ability to secure basic food or shelter." And the court found that Jonas "is not now capable of meaningful participation in a plan of care for himself."

Jonas appeals both the commitment and medication orders.

## III. STANDARD OF REVIEW

" 'Factual findings in involuntary commitment or medication proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[5] "Whether those findings meet the involuntary commitment and medication statutory requirements is a question of law we

---

[5]    *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)).

review de novo."[6]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding That Jonas Was Gravely Disabled.

Jonas argues that the evidence before the superior court did not support a finding of "grave disability" under AS 47.30.915(9)(B). The superior court may order a person involuntarily committed to a treatment facility for up to 30 days if the court finds by "clear and convincing evidence" that the person is "mentally ill and as a result is . . . gravely disabled."[7] "Evidence is clear and convincing if it produces 'a firm belief or conviction about the existence of a fact to be proved.' "[8] We have described this standard "as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt."[9]

> Alaska Statute 47.30.915(9):
>
> "[G]ravely disabled" means a condition in which a person as a result of mental illness
>
> . . . .
>
> (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function

---

[6] *Id.* at 764.

[7] AS 47.30.735(c).

[8] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262-63 (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

[9] *In re Stephen O.*, 314 P.3d at 1193 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 530 n.12 (Alaska 2004)).

independently . . . .

In *Wetherhorn v. Alaska Psychiatric Institute* we held that an involuntary commitment is constitutional only if the patient's "distress" has reached "a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[10]

Jonas argues that the court erred by finding he could not secure food and shelter for himself, and that the remaining evidence did not support a finding that he was "gravely disabled." He analogizes his case to *In re Hospitalization of Stephen O.*, another case in which the respondent's religious beliefs were the basis for finding that he was gravely disabled.[11] There, the respondent testified that Jesus spoke to him and encouraged him to attend church.[12] We reversed the superior court's finding that he was gravely disabled.[13] We concluded that the court had clearly erred by relying "on partial and unclear evidence."[14] We observed that Stephen's symptoms ("a persistent sense that Jesus [was] speaking to him," directing him to attend church, follow his teachings, and maintain an optimistic outlook) "would in no way compromise Stephen's capacity to function independently or live safely."[15] We noted that Stephen had "function[ed] independently before and during the hearing," and no evidence revealed anything

---

[10]   156 P.3d 371, 378 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[11]   314 P.3d at 1193.

[12]   *Id.* at 1187.

[13]   *Id.* at 1197.

[14]   *Id.* at 1195.

[15]   *Id.* at 1196.

"harmful or dangerous about Stephen's religious beliefs or experiences."[16] Therefore we concluded that the "concern that Stephen would decompensate and harm himself at some time in the future was speculative."[17]

Even though Jonas's religious beliefs featured prominently in the petition hearings, that is as far as the comparison between his case and *In re Stephen O.* goes. Jonas asserted that he was not mentally ill and instead was exhibiting a "spiritual phenomenon." The evidence before the court demonstrated that Jonas's religious experiences led him to believe that his family members were demons who cursed him and his apartment, causing him to damage and leave his apartment and to prefer to stay homeless. There also was testimony that Jonas had started a fire by burning notes about his religious experiences. The fire was substantial enough to require a police response. And Jonas testified that mental health professionals "would not be able to distinguish if [his] thoughts are psychotic or not psychotic" unless they understood his religion, leading him to abandon his treatment and medication. He also threatened his father with a knife and made his family fear being around him. Testimony from his treatment provider and Jonas's statements revealed that he was unable to discuss anything except his "intense spiritual li[fe]" and that he would be unable to care for himself if he were released. These factual findings support the superior court's conclusion that, unlike the respondent in *Stephen O.*, Jonas was gravely disabled under the statute.[18] The superior court did not err by finding that Jonas was gravely disabled, and granting the

---

[16]     *Id.* at 1195-96.

[17]     *Id.* at 1195.

[18]     *Id.* at 1195-96; *see* AS 47.30.915(9)(B).

-10-                                            **7607**

commitment petition.[19]

**B.    It Was Error To Fail To Make Adequate Findings On The *Myers* Factors.**

Jonas also argues that the master's findings were not adequate to justify involuntary medication.[20] We held in *Myers v. Alaska Psychiatric Institute* that, because "the right to refuse to take psychotropic drugs is fundamental," "an independent judicial determination of the patient's best interests considered in light of any available less intrusive treatments" was required before authorizing involuntary medication.[21] Before determining whether a patient has capacity to make an informed decision, a treatment facility is required to provide certain information set out in AS 47.30.837(d)(2):

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;

---

[19]    Jonas also points to the superior court's "erroneous factual premise" that his mother would not continue to provide an apartment for him and argues this error fatally undermined the court's finding that he was gravely disabled. Although it was clear error to find that Jonas's mother would not provide an apartment after she testified that she would not provide him *another* apartment, the error was harmless in light of the other evidence presented.

[20]    Because we affirm the superior court's commitment order, we need not address Jonas's argument that the medication order was not appropriate because it was based on an erroneous commitment order.

[21]    138 P.3d 238, 248, 252 (Alaska 2006).

(D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment
. . . .

We suggested in *Myers* that courts consider these factors before making an involuntary medication determination, and they now are known as the *Myers* factors.[22] We have since clarified that considering the *Myers* factors is a requirement.[23]

The master made only a single finding related to the *Myers* factors: a reference to Jonas's mother's testimony that Seroquel, an antipsychotic medication, had "worked pretty well for approximately 13 years." Beyond that, he found that although Jonas did not want to be medicated, "for medical reasons and sometimes for psychiatric reasons, some medications need to be taken on a regular basis . . . [to] allow[] somebody to function safely." The master found by "clear and convincing evidence that the proposed treatment . . . is in [Jonas's] best interest." The superior court's written order was even more vague: the medication was "FDA approved to treat [Jonas]'s mental illness" and "the benefits of these medications outweigh the minimally anticipated risks."

The State argues the court was not required to make specific findings on each of the *Myers* factors, but only on contested and relevant ones. It contends that because Jonas's treatment provider addressed the *Myers* factors and Jonas did not challenge her conclusions or offer contrary expert testimony, none of the factors were

---

[22]     *See, e.g.*, *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009) ("We will here refer to these as the '*Myers* factors.' ").

[23]     *See id.* (clarifying that *Myers* factors "consideration by the trial court is mandatory"); *see also In re Hospitalization of Lucy G.*, 448 P.3d 868, 879 (Alaska 2019) (reiterating mandatory consideration of *Myers* factors and distinguishing other non-mandatory factors).

contested and the court was not required to make any findings. The State also argues that the court addressed Jonas's concerns about side effects when it referred to his mother's testimony that Seroquel had worked in the past and the treatment provider's testimony that she would carefully monitor and adjust the dosages in response to potential side effects.

Jonas counters that he contested two of the *Myers* factors at the petition hearing. He presented evidence about his treatment history and his experience with associated negative side effects. And he testified that "exercise," "a good diet," and "a lot of sunlight" were alternative treatments he would prefer.

The *Myers* factors delineate specific safeguards protecting respondents' rights and allowing for meaningful appellate review.[24] Although the State is correct that this court has only required specific findings on "relevant, contested mandatory *Myers* factors,"[25] Jonas did testify with information relevant to several of the factors. But the single finding that one medication had previously "worked pretty well" is the only finding relevant to *Myers* factors. This testimony addressed the third *Myers* factor which

---

[24] *See In re Lucy G.*, 448 P.3d at 879 ("Because consideration of the *Myers* factors ultimately may allow a court to deny a patient's fundamental right to refuse psychotropic medication . . . we emphasize the importance of such findings to both patient due process and appellate judicial review."); *In re Hospitalization of Jacob S.*, 384 P.3d 758, 772 (Alaska 2016) ("[W]e again emphasize the need for detailed findings when making best-interests decisions."); *Bigley*, 208 P.3d at 180 ("[The *Myers*] factors are 'crucial in establishing the patient's best interests,' which means that their consideration by the trial court is mandatory." (quoting *Myers*, 138 P.3d at 252)).

[25] *See In re Lucy G.*, 448 P.3d at 879 ("[S]uperior courts must make specific findings on relevant, contested mandatory *Myers* factors before ordering involuntary medication.").

requires the court to review the patient's prior medication history.[26]  The master stated that he had "listened carefully" to witness testimony, but neither he nor the superior court addressed Jonas's concerns regarding side effects, as required by the second *Myers* factor, or alternative treatments, as required by the fifth *Myers* factor.

The State also argues that failure to consider the *Myers* factors was harmless because the record clearly supports the court's findings that medication was in Jonas's best interests and that we have previously upheld medication orders despite a lack of detailed *Myers* findings.  But all of the cases cited by the State contain more detailed discussion of the *Myers* factors than this case.  In *In re Hospitalization of Rabi R.*, we affirmed a medication order where the superior court addressed four of the five *Myers* factors, and we concluded that the record contained enough support for the fifth factor that failure to consider it was not clearly erroneous.[27]  And although the superior court's medication order was "sparse," in *In re Hospitalization of Jacob S.* we concluded the superior court had not clearly erred because it "considered Jacob's objections to the magistrate judge's recommendation . . . [and] adopted the magistrate judge's reasoning that [the treatment provider's] testimony supported the best interests finding."[28]  We emphasized, however, "the need for detailed findings when making best-interests decisions."[29]

We have consistently required the superior court to "expressly make or incorporate specific findings on each of these best interest factors in a case where

---

[26]     *See Myers*, 138 P.3d at 252; *In re Lucy G.*, 448 P.3d at 881.

[27]     468 P.3d 721, 737 (Alaska 2020).

[28]     384 P.3d at 772.

[29]     *Id.*

involuntary medication is requested."[30] In *Myers* we underscored that a court must make an independent determination about the respondent's best interests to safeguard the fundamental right to refuse unwanted psychotropic medication.[31] Without specific findings on the relevant, contested *Myers* factors, we are unable to adequately review a medication order to ensure that a patient's fundamental right is respected and that the order is not merely acquiescence to a medical opinion — the exact outcome *Myers* declared unconstitutional.[32] Because the findings by the master and superior court did not specifically address the *Myers* factors, they are not sufficient to allow for meaningful judicial review.

## V.    CONCLUSION

We AFFIRM the superior court's finding that Jonas was gravely disabled. We VACATE the medication order.

---

[30]    *In re Lucy G.*, 448 P.3d at 879; *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 840 (Alaska 2014); *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009).

[31]    *Myers*, 138 P.3d at 250 (holding because it "presents a constitutional question," decision to order involuntary medication must be decision "that hinges not on medical expertise but on constitutional principles aimed at protecting individual choice").

[32]    *See id.* ("[T]he right at stake here — the right to choose or reject medical treatment — finds its source in the fundamental constitutional guarantees of liberty and privacy. The constitution itself requires courts, not physicians, to protect and enforce these guarantees.").