*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of Necessity for the Hospitalization of<br><br>CARTER K. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Supreme Court No. S-18565

Superior Court No. 3AN-22-02472 PR

O P I N I O N

No. 7728 – October 17, 2024

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Michael L. Barber, Barber Legal Services, Boston, Massachusetts, for Carter K. Trevor J. Consoliver, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

## I.    INTRODUCTION

A man appeals his involuntary commitment for mental health treatment and the involuntary administration of psychotropic medication. He argues the court erred by finding that he was gravely disabled and by finding that there was no less restrictive alternative to commitment available. He also challenges the court's findings that the administration of two medications was in his best interests and that there was

no less intrusive treatment available. We affirm the commitment order and medication order for one of the medications, but we vacate the order for the other because there was insufficient evidence to support the court's conclusions about that medication.

## II. FACTS AND PROCEEDINGS

### A. Facts

Before Carter K.[1] was scheduled to be released from jail in October 2022, a mental health professional there filed a petition to have Carter hospitalized for evaluation.[2] The superior court granted the evaluation petition and Carter was transported to the Alaska Psychiatric Institute (API) on October 9.

Two days later, API staff filed petitions to commit Carter for 30 days of treatment[3] and to administer medication.[4] Commitment and medication hearings were held before a superior court master on October 12. Carter waived his presence; his attorney appeared on his behalf. The State presented two witnesses: the nurse practitioner who was Carter's primary provider at API and a court visitor. The master qualified the nurse practitioner as an expert; Carter did not object.

### B. Commitment Hearing

The nurse practitioner testified that he had met with Carter and reviewed Carter's records from "a number of [Department of Corrections] incarcerations" and a brief admission to API in 2020. He testified that he diagnosed Carter with schizophrenia, and he described Carter's "heavily psychotic symptoms," including delusions of being abducted and having his body parts replaced and his blood replaced with uranium. He believed that Carter was having hallucinations and described Carter's communication as "disjointed, disorganized, and at times just completely incoherent."

---

[1]    We use a pseudonym to protect Carter's privacy.

[2]    *See* AS 47.30.700.

[3]    *See* AS 47.30.730.

[4]    *See* AS 47.30.839.

The nurse practitioner opined that if Carter were discharged, he would not be able to meet his immediate needs for food, clothing, or safety. He stated that Carter was unable to articulate where he would go upon release, even with "mild prompting" to consider a homeless shelter. He acknowledged that Carter had been eating at API and that Department of Corrections (DOC) records indicated that he ate and drank while in jail. But he testified that when he asked Carter where he would obtain food in the community, Carter responded by saying "better welfare" without elaborating. He opined that Carter would be "at extreme risk for hypothermia" and might steal food or items from a store because he could not "functionally perform the task of paying for an item." He also testified that he did not believe Carter had any financial support or a guardian, or that he received Social Security benefits.

When asked whether Carter had ever functioned at a higher level, the nurse practitioner responded, "Well, because he's alive, I have to believe that he has been more functional previously." But he also observed that being in jail would have provided some services and structure for Carter to meet some of his basic needs. He testified that Carter probably had been able to find shelter in the past "[b]ecause he remains alive." But he did not think Carter would be "capable of keeping himself alive" if discharged.

The master made oral findings and recommended that Carter be committed to API for 30 days. The master found that Carter was gravely disabled under former AS 47.30.915(9)(B) because his schizophrenia caused a significant impairment of his judgment and ability to function independently. The master concluded that Carter's baseline without treatment was a "jail to street" cycle, but that he was not currently capable of doing even that. The master found that Carter could not "communicate in a sensible, linear way[,] . . . articulate how to acquire food[, or] . . . where to find shelter," and that if he remained untreated, he would "continue to suffer . . . abnormal mental distresses."

## C. Medication Hearing

A hearing on the medication petition immediately followed the commitment hearing. A court visitor testified that she had reviewed Carter's medical records, checked court system records and social media, contacted the nurse practitioner at API, spoken with Carter for about 20 minutes, and attempted to contact Carter's father. She determined that at some point Carter had received outpatient services through Southcentral Foundation but did not have time to find out more information. She testified that Carter told her he refused medications because his body was "ionic and bionic" and that medications would make his body rusty. When she asked him where he would go when he left API, he responded that he would go to "the shelter under the protection of the Murkowskis" and the "CRP shelter."[5] She testified that it appeared that Carter did not have a guardian and it was not clear whether he had an advanced health directive. The court visitor did not believe Carter was competent to give or withhold informed consent.

The nurse practitioner testified again. He stated that the court visitor's report was consistent with his experience with Carter. He stated that Carter could not make an informed choice about medications because Carter's reason for refusing was his belief that they would cause his body to rust, which was not "a logical reason." And he testified that Carter's primary needs had to be met through medication rather than talk therapy alone.

The nurse practitioner testified that he had listed three medications in his petition: olanzapine, lorazepam, and diphenhydramine. He stated that olanzapine is highly effective at reducing the symptoms Carter was displaying. He expected that olanzapine would reduce Carter's "delusional thought content" and lead to a "more linear" thought process and less "pressured speech." He also testified that he expected

---

[5] The Coordinated Resource Project is the title of the therapeutic court program in Anchorage that serves mentally ill individuals.

to see improvements in Carter's mental health within the first two weeks of administering olanzapine and hoped that would allow Carter to engage in a discharge plan and discuss treatment. But without the medication, he expected that Carter's condition "would not get better" at a minimum and would "continue[] [to] deteriorat[e]" at worst.

The nurse practitioner then discussed the potential short-term and long-term side effects of olanzapine, which include extrapyramidal symptoms,[6] tardive dyskinesia,[7] constipation, and weight gain. He testified that he requested to be allowed to administer diphenhydramine in the event that Carter developed extrapyramidal symptoms. He testified that close supervision at API would allow tardive dyskinesia to be caught early and attenuated, and that olanzapine would then be reduced or stopped if Carter developed those symptoms.

The nurse practitioner also requested to be allowed to administer lorazepam to reduce aggression and agitation. He acknowledged that Carter had not been aggressive or agitated at API, but some of Carter's records indicated he had such behavior in the past. He testified that lorazepam would only be administered "in the event that agitation occurs," for example if Carter became aggressive when "confronted by a court-ordered medication with an intramuscular backup."

The master made oral findings and recommended approving the administration of the three requested medications. The master found that Carter was unable to give informed consent, that he was not "linear" or "rational," and that his objection that medication would make his body rust was not logical. The master stated:

---

[6] Extrapyramidal symptoms are involuntary muscle movements that may include "hand flapping," "foot tapping," or "thrusting their tongue out repeatedly."

[7] Tardive dyskinesia is an involuntary muscle movement disorder affecting facial and body movements that can be irreversible but can be attenuated if caught early on.

If [Carter] . . . is going to . . . be restored to a place where he can be not delusional, where he can return to the street, even if it is street-jail, street-jail, his primary needs can only be met through medications. Schizophrenia is a chronic disease, it's a debilitating disease. It causes deterioration of a person's brain if they are not treated with medication, and we certainly do not want that to continue to happen with [Carter].

## D.    Superior Court Adoption Of Master's Recommendations

Neither party objected to the master's findings or recommendations. The superior court adopted the master's findings, ordered Carter committed for 30 days, and authorized the involuntary administration of medication.

Carter appeals both orders. He argues the superior court erred by finding he was gravely disabled and there was no less restrictive alternative to commitment. He also argues that the court erred by approving the involuntary administration of olanzapine and lorazepam, that the court improperly relied on facts not in evidence, and that it failed to conduct the required best interests and least intrusive alternative inquiries. As a threshold matter, the State responds that because Carter did not object to the master's proposed findings, he must show plain error on appeal. Carter also argues that if his attorney's failure to object precludes review of his claims, then his attorney provided ineffective assistance.

## III.   STANDARD OF REVIEW

"We review the superior court's factual findings in involuntary commitment or medication proceedings for clear error" and will disturb those findings only where there is a "definite and firm conviction that a mistake has been made."[8] We will not reweigh evidence if the record supports the trial court's finding.[9] Whether

---

[8]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[9]    *In re Jacob S.*, 384 P.3d at 766.

those factual findings "meet the statutory requirements for involuntary commitment or medication is a question of law to which we apply our independent judgment."[10]

"We review issues raised for the first time on appeal for plain error."[11] "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "[12]

## IV. DISCUSSION

### A. Carter Must Demonstrate Plain Error.

Standing masters may be appointed to conduct hearings in a variety of cases. The applicable court rules describe masters' authority and the procedures that control hearings.[13] Alaska Civil Rule 53 describes the general procedure for the appointment of masters in civil cases and describes their authority. Subsection (d)(2) states that "[w]ithin 10 days after being served with notice of the filing of the [master's] report any party may serve written objections thereto upon the other parties." In *Duffus v. Duffus* we concluded that this language "requires any party who disagrees with a master's finding to file a timely objection to the finding at the trial court level as a prerequisite to challenging the finding on appeal."[14] In doing so we agreed with "virtually every court that has addressed similar rules."[15] We explained that requiring timely objections to a master's proposed findings serves the court's "interest in judicial

---

[10]     *In re Naomi B.*, 435 P.3d at 923-24.

[11]     *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[12]     *In re Hospitalization of Tonja P.*, 524 P.3d 795, 800 (Alaska 2023) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

[13]     *See, e.g.*, Alaska Adoption Rule 3; Alaska Child in Need of Aid Rule 4; Alaska Delinquency Rule 4; Alaska Rule of Probate Procedure 2.

[14]     72 P.3d 313, 318 (Alaska 2003).

[15]     *Id.* at 319.

economy and fairness to opposing litigants."[16]  And we held that failure to object precludes appellate review except for plain error.[17]

Commitment and medication hearings are probate matters; the probate rules control those hearings.  Probate Rule 2(f)(1) states:  "Objections to a master's report or recommendation must be filed within 10 days of the date of notice of the report . . . unless the court otherwise provides."  Although the language of the probate rule is similar to that of the civil rule, the probate rule's language is stronger.  While Civil Rule 53(d)(2) states that "any party *may* serve written objections" within 10 days of the master's report, Probate Rule 2(f)(1) states that "[o]bjections to a master's report or recommendation *must* be filed within 10 days."[18]  As already noted, we held that "may" in Civil Rule 53 required a timely objection to preserve a claim.[19]  Probate Rule 2(f)'s language is clearly mandatory:  a party "must" file a timely objection to preserve a claim for appeal.[20]

We have not previously stated that timely objections to masters' recommendations are required in commitment proceedings.  But a review of our previous commitment cases reveals that we and many litigants have assumed that issues not raised before the master are reviewed only for plain error.[21]

---

[16]     *Id.* at 318.

[17]     *Id.* at 319.

[18]     Emphasis added.

[19]     *Duffus*, 72 P.3d at 318.

[20]     We note that Adoption Rule 3(f), CINA Rule 4(f)(1), and Delinquency Rule 4(f) have identical language.

[21]     *See, e.g.*, *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (reviewing for plain error where counsel failed to object to hearing held more than 72 hours after statutory deadline); *In re Hospitalization of Rabi R.*, 468 P.3d 721, 729 n.8 (Alaska 2020) (citing Civil Rule 53(d)(2)(B) when acknowledging respondent filed written objections as required by rule to standing master's recommendations); *In*

Carter argues that timely objection should not be required in commitment cases because of the "massive curtailment of liberty" at issue. But that liberty interest is exactly why objections must be promptly made — to protect against unwarranted deprivations of respondents' liberty. Not only does requiring objections to masters' recommendations serve the interests of judicial economy and fairness to litigants, it provides the respondent an immediate means to address any errors in a hearing before a master, because objections require review by the superior court.[22] Timely objections to the master's findings provide meaningful and immediate potential relief. This is especially important given the liberty interest at stake, the relative brevity of commitment and medication orders, and the fact that claims are generally moot by the time they reach this court.

## B. Ineffective Assistance Claims Must Be Raised In The Trial Court.

Carter argues that if his attorney's failure to object to the master's findings precludes review of his claims, then that failure amounts to ineffective assistance of counsel. He urges us to recognize a prima facie case of ineffective assistance from the existing record and to exempt his case from the normal requirement that claims of ineffective assistance be raised in the trial court.

In *Wetherhorn v. API*, we declined to hear an ineffective assistance claim on direct appeal and held that respondents must seek a new commitment and medication hearing by a motion for relief in the superior court under Civil Rule 60(b) or by a Civil

---

*re Hospitalization of Tonja P.*, 524 P.3d 795, 800 (Alaska 2023) ("[Respondent] acknowledges that because she did not object to the [court] visitor's report in superior court, she must show . . . plain error."); *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019) (explaining that issues raised for first time on appeal are reviewed for plain error (citing *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 379 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019) ("[T]hese procedural issues were not raised below and are therefore waived unless they constitute plain error."))).

[22]     *See* Alaska R. Prob. P. 2(f)(1).

Rule 86 habeas corpus petition.[23]  This is because, as in the criminal context, it is difficult for an appellate court to review a claim of ineffective assistance of counsel without a record that includes findings of fact and conclusions of law regarding that claim.[24]  Allowing ineffective assistance claims to be raised on appeal would require us to engage "in the perilous process of second-guessing."[25]  And we declined to do so.

We have recognized one exception to this rule in child in need of aid (CINA) cases to avoid delay in achieving permanency for the child.[26]  But there is no such need for a quick resolution here.  Commitment cases are almost always moot by the time they reach us due to the limited period of commitment, whether 30, 90, or 180 days.  And for the same reasons that objections must be made within 10 days, the massive curtailment of liberty at stake in these cases underscores the need to raise ineffective assistance claims in the superior court rather than waiting for appeal.  The superior court can act promptly to hold evidentiary hearings and consider ineffective assistance claims to protect a respondent against an unwarranted deprivation of liberty. We are not persuaded that we should vary the position we took in *Wetherhorn*.

## C. The Superior Court Did Not Err By Ordering Commitment.

Under  AS 47.30.735 a respondent can be committed for involuntary treatment only if the court finds "by clear and convincing evidence that the respondent is mentally ill and as a result . . . is gravely disabled."[27]  The court must also find by clear and convincing evidence that no less restrictive alternative exists that would

---

[23]    156 P.3d at 384.

[24]    *Id.* (citing *Barry v. State*, 675 P.2d 1292, 1295 (Alaska App. 1984)).

[25]    *Id.* (quoting *Barry*, 675 P.2d at 1295).

[26]    *See Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1266 (Alaska 2014); *Penn P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 659, 668-70 (Alaska 2023).

[27]    AS 47.30.735(c).

provide adequate treatment and protection from harm.[28] It is uncontested that Carter is mentally ill. Carter asserts and must demonstrate that it was plain error for the court to find that he was gravely disabled or that there was no less restrictive alternative available.

### 1. Gravely disabled

Carter argues the court erred by finding him gravely disabled as a result of mental illness under former AS 47.30.915(9)(B).[29] The statute defines "gravely disabled" in relevant part as:

> a condition in which a person as a result of mental illness . . . will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.[30]

We determined that this definition is constitutional only if it is construed to require "a level of incapacity so substantial that the respondent is incapable of surviving safely in freedom."[31] Additionally, "[t]o prove distress and deterioration the State must establish

---

[28] AS 47.30.735(d); *see In re Hospitalization of Mark V.*, 375 P.3d 51, 58-59 (Alaska 2016), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019) ("Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization.").

[29] The definition of "gravely disabled" was amended by the legislature in 2022 but the amended provision did not take effect until October 13, 2022, the day after Carter's hearings. *See* Ch. 41, § 29, SLA 2022.

[30] AS 47.30.915(9)(B).

[31] *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 384 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918 (Alaska 2019). At the time *Wetherhorn* was decided, "gravely disabled" was defined by AS 47.30.915(7), but the definition was identical to former 47.30.915(9)(B).

a baseline level of the individual's ability to function independently in order to demonstrate that there has been a substantial deterioration of that ability."[32]

Carter argues that the statute requires proof of his deterioration and that there was no evidence of functional decline except the nurse practitioner's "speculative conclusion" that, based on the fact that he was alive, Carter must have previously functioned at a higher level. Carter argues there was no evidence that his level of psychosis during the hearing differed in any way from his level of psychosis while living independently in a "jail to street" baseline cycle or that he would be unable to survive on his own without treatment.

In *In re Hospitalization of Naomi B.* we upheld a commitment order despite the respondent's argument that certain testimony supporting the court's gravely disabled finding was "speculative" and "weak."[33] We noted that the psychiatrist's testimony on which the court relied was uncontroverted, that the respondent pointed to nothing in the record to contradict the testimony, and that there was no countervailing evidence presented to the court.[34] Here, the nurse practitioner was an expert witness and his testimony was uncontested and uncontroverted. He based his expert opinion on his own interactions with Carter as a treatment provider as well as his review of records from API and DOC. His conclusions about Carter's previous functionality were based directly on that information and Carter presented no evidence to contradict the nurse practitioner's testimony. And it is not our role to reweigh the evidence.[35]

---

[32] *In re Hospitalization of Carl S.*, 510 P.3d 486, 494 (Alaska 2022) (internal quotation marks omitted); *see also Wetherhorn*, 156 P.3d at 376 ("[M]ental illness alone is insufficient to form a constitutionally adequate basis for involuntary commitment.").

[33] 435 P.3d 918, 932 (Alaska 2019).

[34] *Id.*

[35] *See In re Hospitalization of Jacob S.*, 384 P.3d 758, 766 (Alaska 2016).

The master's finding that Carter was gravely disabled was neither an "obvious mistake" nor "obviously prejudicial."[36] Although the nurse practitioner did not have documentation or personal experience with Carter's previous level of functioning, he offered his opinion that Carter must have functioned at a somewhat higher level based on his interactions with Carter. Those interactions led him to believe that Carter was unable to function independently at that time, which was inconsistent with an ability to survive on the street. He testified that Carter's "disjointed, disorganized, and at times just completely incoherent" thought process led him to believe Carter would be incapable of finding food or shelter. Carter's ability to survive in the past in the absence of any known means of support suggested that his baseline must have previously been higher because, at his then-current level, the nurse practitioner did not believe he would be able to meet his basic needs. And although Carter had been incarcerated and released on multiple occasions, there was no indication or API record showing that DOC staff had previously filed a petition for hospitalization, which suggested he had not displayed these symptoms previously.

Evidence in the record suggested that Carter had been able to survive independently in the past and that he would not have been able to do so at the time of the hearing. It was not plain error for the superior court to find he had deteriorated from his "jail to street" baseline and was gravely disabled.

### 2. Less restrictive alternatives

Carter argues that the superior court "failed to articulate why API social work or community food and shelter resources were not feasible less restrictive alternatives." He also notes the court's awareness of API social work services to help patients get connected with community resources and Social Security Disability Insurance. The State contends that nontreatment is not a proper alternative within the

---

[36] *See In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

meaning of the statute and that the evidence showed outpatient treatment would not be effective for Carter.

A less restrictive alternative involves "mental health treatment facilities and conditions of treatment" that "are no more . . . intrusive than necessary to achieve the treatment objectives of the patient," and "involve no restrictions on physical movement . . . except as reasonably necessary for the administration of treatment or the protection of the patient . . . from physical injury."[37]  This is a "constitutional prerequisite to involuntary hospitalization" because it "places a substantial burden on a fundamental right."[38]  The burden is on the State to prove there are no less restrictive alternatives available,[39] but the court need only consider proposed less restrictive alternatives that are actually feasible for meeting the respondent's needs.[40]

Nontreatment by providing social work or community food and shelter does not meet the statutory requirements, which explicitly require "treatment" and "mental health facilities."[41]  And there was no evidence that Carter could or would go to a shelter or work with API social workers when discharged, even after the nurse practitioner "prompted" him about it.

Carter attempts to distinguish his case from two in which we upheld superior court findings that there were no less restrictive alternatives available due to

---

[37]  AS 47.30.915(11); *see* AS 47.30.915(14).

[38]  *In re Hospitalization of Naomi B.*, 435 P.3d 918, 933 (Alaska 2019).

[39]  *In re Hospitalization of Mark V.*, 375 P.3d 51, 56 (Alaska 2016) ("Proving the respondent's inability to function independently with support, when relevant, is simply a part of the [State's] burden of proving that there is no less restrictive alternative to involuntary commitment — a required element of any petition."), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918.

[40]  *In re Naomi B.*, 435 P.3d at 933-34.

[41]  AS 47.30.915(11); *see* AS 47.30.915(14).

the respondents' inability to obtain food and shelter independently.[42]  Carter suggests that the no less restrictive alternative findings in *In re Naomi B.* and *In re Connor J.* were based on the respondents' combativeness and aggression when untreated by medication, which kept them from obtaining basic services outside of API.[43]  Carter argues that there is no evidence his mental illness would prevent him from obtaining food or shelter if they were available, and that testimony showed that Carter was accepting food and water and had not been aggressive or violent while at API.  But those cases were not based on the respondents' aggression alone.[44]  And as the State points out, there are numerous cases in which we have upheld least restrictive alternative and grave disability findings where experts testified that medication was necessary and the respondent could not operate independently, just as here.[45]

---

**42**     *See In re Naomi B.*, 435 P.3d 918 (Alaska 2019); *In re Hospitalization of Connor J.*, 440 P.3d 159 (Alaska 2019).

**43**     *See In re Naomi B.*, 435 P.3d at 922, 932; *In re Connor J.*, 440 P.3d at 160-62, 166-67.

**44**     *See In re Naomi B.*, 435 P.3d at 932-34 (relying on superior court's conclusion that proposed less restrictive alternatives would not protect public from danger respondent posed and respondent needed "a facility like API that is locked and . . . provides 24/7 care"); *In re Connor J.*, 440 P.3d at 165-67 (noting that respondent would need structure provided by API because he refused to be treated on outpatient basis).

**45**     *See, e.g.*, *In re Hospitalization of Mark V.*, 375 P.3d 51, 59-60 (Alaska 2016) (affirming commitment order based on findings that respondent "needed medications and [was unable] to follow an outpatient regimen," could not "understand his situation, symptoms or current illness," and "would be entirely unable to fend for himself independently"), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918; *In re Hospitalization of Joan K.*, 273 P.3d 594, 602 (Alaska 2012) (affirming commitment order based on testimony from mental health professionals that outpatient treatment "require[s] a patient stable enough to have insight into one's behavior" and that respondent lacked sufficient insight and perspective about her condition and need for treatment); *In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 88-89 (Alaska 2012) (affirming grave disability finding based on patient's equivocal and contradictory

In *In re Hospitalization of Rabi R.* we held that the superior court had not erred by determining outpatient treatment was not a less restrictive alternative to commitment where evidence showed the respondent had "no insight into his illness," had been unable to care for himself outside an institution, and had refused medication, but his psychiatrist believed he would improve if he were committed for treatment.[46] The evidence here similarly showed that Carter's condition was expected to improve with medication. But Carter has a history of refusing medication and the nurse practitioner opined that outpatient treatment would not meet Carter's needs because he would likely not be able to follow up with any mental health appointments or consistently take necessary medication. Carter's reason for refusing medication, that his body was "ionic and bionic" and medication would make it rust, is also not logical and demonstrates a lack of insight into his need for treatment. And the nurse practitioner was concerned Carter would be unable to meet his basic needs in the community. These facts indicate that outpatient services would not "achieve the treatment objectives," as the statute requires.[47]

The superior court did not plainly err when it found that commitment was the least restrictive treatment available.

---

testimony about whether he would continue taking medication — and doctor's conclusion that he would not); *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1087, 1094 (Alaska 2011) (upholding grave disability finding where patient was unlikely to seek outpatient treatment and stay on medication and would be hospitalized again, as had happened three recent times).

[46] 468 P.3d 721, 735-36 (Alaska 2020).

[47] *See* AS 47.30.915(11); AS 47.30.915(14).

**D.** **It Was Plain Error To Order The Involuntary Administration Of Lorazepam.**

"The right to refuse psychotropic medication is a fundamental right protected by the Alaska Constitution's guarantees of liberty and privacy."[48] A respondent committed for mental health treatment may be forced to take medication only if the court finds, by clear and convincing evidence, that the medication plan is in the respondent's best interests; no less intrusive treatment is available; and the respondent lacks capacity to give or withhold informed consent to the treatment.[49] Carter challenges the superior court's findings that olanzapine and lorazepam were in his best interests and that there was no less intrusive treatment available.

In *Myers v. Alaska Psychiatric Institute*, we explained the five factors that must be considered to determine whether the administration of involuntary medication is in the patient's best interests.[50] Those factors include:

> (A) an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B) information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C) a review of the patient's history, including medication history and previous side effects from medication;
>
> (D) an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

---

[48] *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 180 (Alaska 2009).

[49] *Id.* at 179-80; *see* AS 47.30.836; AS 47.30.837(d); AS 47.30.839(g).

[50] 138 P.3d 238, 252 (Alaska 2006); *see In re Hospitalization of Jonas H.*, 513 P.3d 1019, 1025 (Alaska 2022) ("We have since clarified that considering the *Myers* factors is a requirement.").

(E) information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.[51]

We require specific findings only on relevant, contested *Myers* factors.[52]

Involuntary medication cannot be ordered if less intrusive alternatives are available.[53] Determining whether a less intrusive alternative exists involves the balancing of legal rights and interests, as well as a factual inquiry into alternative treatments.[54] A proposed alternative "must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[55]

### 1.    Olanzapine

Carter argues that there were "relevant and contested" *Myers* factors not specifically addressed by the superior court. He asserts that the record demonstrates "his clear objection to the administration of medication." But Carter was not present at the hearing and his attorney did not object to the administration of olanzapine or present any evidence during the hearing. None of the *Myers* factors were actually contested and the court was therefore not required to make specific findings on them.[56] But the court was still required to consider each of the factors.[57]

In *In re Hospitalization of Lucy G.* we determined that the superior court's oral ruling "adequately reflect[ed] its various findings related to each *Myers* factor"

---

**51**    *Myers*, 138 P.3d at 252; *see* AS 47.30.837(d)(2).

**52**    *In re Jonas H.*, 513 P.3d at 1025.

**53**    *Bigley*, 208 P.3d at 185.

**54**    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 935 (Alaska 2019).

**55**    *Id.* at 936 (quoting *Bigley*, 208 P.3d at 185).

**56**    *See In re Jonas H.*, 513 P.3d at 1025.

**57**    *Bigley*, 208 P.3d at 180.

even though it did not match each of those findings to specific factors.[58] We highlighted that the superior court explained that the respondent suffered from catatonia and was unable to care for her basic needs; it incorporated the physician's testimony regarding the various factors into its findings; it considered the respondent's likelihood of improvement without treatment; and it addressed proposed alternatives and explained that the proposed treatment was the respondent's only real option.[59] Carter raises issue with the superior court's findings on the first, second, and fifth factors. But, as in *In re Lucy G.*, the record shows the court considered each of them.

As to the first factor,[60] the master acknowledged Carter's schizophrenia diagnosis and found that without medication he was "not linear, he's not rational, his objections to medication are not logical objections or reasonable objections"; his "declining medication because he's going to rust . . . is not a logical reason to decline medication"; and he was delusional. The court found that medication would treat Carter's delusions and deterioration and allow him to return to his "street-jail" baseline.

Evidence supports these findings. Both witnesses testified about Carter's delusions and his "rather tangential and somewhat nonsensical," "disjointed, disorganized, and at times just completely incoherent" speech and thoughts. Carter was unable to answer questions about obtaining food and shelter. The nurse practitioner predicted Carter would continue to deteriorate without medication but would likely improve with olanzapine. He expected olanzapine to reduce Carter's delusions, allow his thought process to become more linear, and result in less pressured speech.

As to the second *Myers* factor,[61] the master found that any potential side effects were outweighed by the expected benefits to Carter, and observed that the

---

[58]    448 P.3d 868, 880 (Alaska 2019).

[59]    *Id.* at 880-82.

[60]    *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 252 (Alaska 2006).

[61]    *Id.*

proposed doses and uses were within the FDA-approved limits. The nurse practitioner testified that olanzapine would treat Carter's psychosis and reduce symptoms to the point that he could discuss a discharge plan. He explained the dosage he planned to start Carter on and why, and that he would adjust the dosage based on Carter's response. He testified that the dosages were within the medical standard of care and that injection would be used only as a backup mode of administration. He described the potential side effects of olanzapine, and how he would address them if they occurred.

As to the fifth *Myers* factor,[62] the master found that Carter's "primary needs can only be met through medication," and that it was more likely Carter would "gradually deteriorate" without treatment. The nurse practitioner testified that Carter's needs could not be met through talk therapy or outpatient services, and that Carter would not be able to make follow up mental health appointments or take medication on his own. And the master found, based on testimony from both witnesses, that Carter "can't communicate in a sensible, linear way," which further suggests talk therapy could not be effective.

Carter argues that the court erred when it adopted the master's recommendations by relying on the nurse practitioner's testimony, which he claims is unsupported by specific expert knowledge, and that the court impermissibly "acquiesced to [the nurse practitioner's] medical opinion," a result we have declared unconstitutional.[63] But the nurse practitioner's expert testimony was uncontested, and Carter did not object to the master's findings.[64]

Carter also argues the master's determination that the administration of olanzapine was in his best interests erroneously relied on the master's finding that the

---

[62]   *Id.*

[63]   *See In re Hospitalization of Jonas H.*, 513 P.3d at 1026 (citing *Myers*, 138 P.3d at 250).

[64]   *See id.* at 1025.

drug was necessary to prevent the continued deterioration of his brain. He argues that no evidence was presented to suggest that schizophrenia causes brain deterioration or that his brain was deteriorating.[65] The State argues that the nurse practitioner's testimony that Carter would continue to deteriorate provided sufficient evidence for the court's finding. It also argues that the nurse practitioner's opinion that Carter must have previously been higher functioning and testimony from both witnesses about symptoms support the court's finding.

Although there was evidence that Carter's condition had deteriorated and would continue to deteriorate, no evidence that schizophrenia causes deterioration of the brain was presented to the master. The master's oral finding that it does was error.[66] But it was not repeated in the written findings, which suggested only that Carter would "gradually deteriorate" without treatment. Because there was sufficient evidence to support finding that medication would halt Carter's general deterioration, this error was harmless.

### 2. Lorazepam

Carter argues that the superior court erred by ordering the involuntary administration of lorazepam because it made no specific findings regarding whether it was in Carter's best interests or whether less intrusive alternatives were available. We agree.

In *Myers*, we explained that "an independent judicial best interests determination is constitutionally necessary to ensure that the proposed treatment is

---

[65] During the hearing, the master stated: "Schizophrenia is a chronic disease . . . . It causes deterioration of a person's brain if they are not treated with medication, and we certainly do not want that to continue to happen with [Carter]."

[66] *See In re Hospitalization of Rabi R.*, 468 P.3d 721, 732 (Alaska 2020).

actually the least intrusive means of protecting the patient."[67] The *Myers* factors are "crucial in establishing the patient's best interests, which means that their consideration by the trial court is mandatory."[68] There is an absence in the record of evidence that could have supported the superior court's conclusion that lorazepam was in Carter's best interests. The written order states: "These medications are within the normal medical standard of care and approved by the FDA for the proposed usage. The proposed usage is to address the Respondent's symptoms." The master's oral findings noted that Carter's "primary needs can only be met through medications," "the doses and the uses are all FDA approved," and "the benefits outweigh the problems that it could cause [Carter]." These findings are very general, applying to both lorazepam and olanzapine.

There is no evidence in the record to suggest the court could have considered the side effects, drug interactions, or risks associated with taking lorazepam — correlating to the second, fourth, and fifth *Myers* factors. There was also no evidence presented to support finding there were no less intrusive alternatives available, and the nurse practitioner acknowledged that Carter had not displayed agitated behavior at API, suggesting there was not a present need for lorazepam.

Because Carter did not file objections, he is entitled to relief only if he can show plain error, which "involves an obvious mistake that is obviously prejudicial."[69]

---

[67] *Myers*, 138 P.3d at 250; *see also Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009) ("[T]he best interests and least intrusive alternative inquiries under *Myers* are parts of a constitutional test of the validity of API's proposed treatment.").

[68] *Bigley*, 208 P.3d at 180 (internal quotation marks omitted).

[69] *In re Hospitalization of Tonja P.*, 524 P.3d 795, 800 (Alaska 2023) (internal quotation marks omitted) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

Because the superior court was constitutionally required to consider the *Myers* factors but failed to do so, this case is distinguishable from other civil commitment cases where the superior court's failure to make *statutorily* required findings was not obviously prejudicial.[70] The outcome here very well may not have changed if the *Myers* factors were properly considered. It was therefore plain error to grant the authority to administer lorazepam.

## V.    CONCLUSION

We AFFIRM the commitment order and the medication order for olanzapine. We VACATE the order for lorazepam.

---

**70** *See, e.g.*, *In re Hospitalization of Connor J.*, 440 P.3d 159, 164-65 (Alaska 2019) (finding superior court's failure to inquire into basis for respondent's waiver of presence at commitment hearing as required by statute was not obviously prejudicial because respondent did not allege it would have affected the outcome of the proceedings).